JOHN A. WILLIAMS V. THE STATE.

*No. 3745.   Decided November 4.*

1.  Indictment—Train Robbery—Murder.—Where the deceased was killed by the derailing of a train of cars occasioned by the act of defendant, and defendant after such derailment robbed certain parties on said train, and the indictment alleged such facts, *held*, on motion to quash, that said indictment was not uncertain, and that it sufficiently charged a murder committed in the perpetration of robbery.

2.  Practice—Juror—Peremptory Challenges.—Unless a defendant in a criminal case exhausts his peremptory challenges, this court will not consider a bill of exceptions as to the competency of a juror.

3.  Evidence—Cross-Examination of Witness.—Where a witness for defendant on cross-examination was asked if she knew the result of the trial of her husband (who had previously been tried for the same offense), and she answered she did; whereupon she was further asked, what was the result of said trial? to which defendant objected, and witness was not allowed to answer the question; *held*, no error nor prejudice to the defendant is shown.

4.  Argument—Privilege of Counsel.—Where defendant's counsel in argument stated that the accused was on trial "before strangers and among strangers," *held*, that it was not error or prejudicial for the district attorney to reply, "that if the defendant was on trial before strangers the State was not responsible for it, because the defendant had himself removed, by change of venue, his case from the county where he was known to the county where he was being tried."

5.  Robbery—Murder—Charge of Court.—By provisions of article 606 of the Penal Code, a murder committed in the perpetration of robbery is *per se* murder in the first degree; and in such case a special requested instruction upon murder in the second degree was properly refused.

APPEAL from the District Court of Cass.   Tried below before Hon. John L. Sheppard.

Appellant was indicted in the District Court of Bowie County for the murder of Mike Hackett, which murder was alleged to have been committed on or about the 9th day of June, 1890.   The charging part of the indictment is as follows, to-wit:   That he "did then and there willfully and with malice aforethought kill and murder one Mike Hackett, by then and there displacing and interfering with a certain switch of the St. Louis, Arkansas & Texas Railway, and thereby wrecking and injuring a car and train of cars on said railway, and thereby mashing, wounding, and bruising the said Hackett, who was then and there on said train of cars; from which said mashing, wounding, and bruising, inflicted in the manner and by the means aforesaid, the said Hackett did then and there instantly die; and that the said displacing and interfering with said switch, and the said wrecking and injuring of said car and train of cars, and the said killing and murder of said Hackett, were each and all committed by the said John A. Williams in the perpetration of robbery; in this, that the said Williams did then and there fraudulently take from the person and possession of one S. L. Neblett, who was then and there upon said train of cars, and by as-

sault and violence upon the said Neblett, and by putting the said Neblett in fear of life and bodily injury, certain personal property, to-wit, * * * [here the various packages, containing money, jewelry, and other valuables, are specifically set out in the indictment], the property of him, the said Neblett, with the intent of him, the said John A. Williams, to appropriate the same to his own use; and in the perpetration of the said crime of robbery, and by the displacement of and interference with said switch, and the wrecking and injuring of said car and train of cars, all as aforesaid, the said John A. Williams did then and there kill and murder the said Mike Hackett as aforesaid, against the peace and dignity of the State."

Defendant made a motion to change the venue in the case, based on both the statutory grounds named in article 578 of Code of Criminal Procedure. This motion was granted, and the venue was changed from Bowie to Cass County. The case having been regularly tried in the District Court of this last (Cass) County, resulted in defendant's conviction of murder in the first degree, with a penalty assessed at imprisonment at a life term in the penitentiary. The record is most voluminous, the statement of facts alone containing the testimony of forty-eight witnesses, and embracing 192 pages of the transcript.

The evidence discloses a most interesting case of train robbery, concocted and carried into successful execution by this appellant John A. Williams, Napoleon McDaniels, John Brawley, and Jim Ratcliff. It discloses that Jim Ratcliff, one of the confederates, died in jail, after his arrest, from a wound received during the melee attendant upon the robbery, from a pistol shot received accidentally at the hands of his coconfederate McDaniels. It discloses that McDaniels, one of the confederates, was indicted, tried, and convicted for this same train robbery and murder, and sentenced to a life term in the penitentiary. John Brawley, the other confederate, turned State's witness, and his testimony was the principal evidence adduced against this defendant on his trial. We deem it only necessary to give in full the testimony of the confederate John Brawley, with the statement that every essential detail of the transaction as testified to by him was corroborated in the most remarkable manner by the facts and circumstances testified to by the other witnesses in the case; as for instance, the bunch of railway switch keys mentioned by witness as having been dropped by John Williams on the railway track, at the place of the wreck, on the night of the robbery, were found at that place by other witnesses. A coat was found near the scene of the robbery which had a mask in one of the pockets, and which coat was identified as belonging to Napoleon McDaniels. Another coat was found in an old deserted well near the home of Jim Ratcliff, several miles distant from the scene of the robbery, and in one of its pockets was found a mask which corresponded with a mask found in the pocket of the other coat, and that coat

was proved to be the property of John A. Williams, this appellant. Appellant's room was searched after he was suspected and arrested. And in the room was found false hair and false whiskers, the black silk handkerchief mask spoken of by the witness Brawley and several other witnesses, and also some jewelry, one of the packages taken from the express messenger at the time of the robbery being a package of jewelry; also, a pair of wet, muddy pants, and between the mattresses of his bed was found a vest which corresponded with the McDaniels coat. The pistol which Williams gave to Brawley, and which the latter used on the night of the robbery, was found in an old well behind the Arkansas postoffice in Texarkana, and was identified at the trial. The express messenger (Neblett) testified fully with regard to the wrecking of the train and the robbery, and as to his ownership and control of the packages alleged in the indictment which were taken from his safe by the robbers. This witness also testified, that there were some forty or fifty shots fired in all, and that he had one of his fingers shot off during the melee. The murdered man Mike Hackett, after the wreck and robbery, was found dead on the front end of the express car. He was pressed in between the tender and the railing around the platform, and must have been sitting down, as the railing caught him about the chest and crushed and doubled up his legs against his body. The colliding of the tank of the engine and the express car caused the man's death. The wrecking of the train was what killed him.

The character and antecedents of three of the robbers lends additional interest to the case. It was shown that this appellant, John A. Williams, had been deputy sheriff of Bowie County, United States deputy marshal, and policeman and detective in the city of Texarkana, and had acquired quite a reputation as a detective. It was shown that Napoleon McDaniels had served for several years as policeman in the city of Texarkana, and that John Brawley had served for five or six years as deputy sheriff of Ellis County, and that in 1882 he was elected sheriff of that county and served out his term of office as such.

John Brawley, for the State, testified: My name is John Brawley. I have been living in Hot Springs County, Arkansas, with my brother George Brawley. I came from there here. I was born in Coffee County, Tennessee; lived there until I was 10 years old, when I went to Hot Springs County, Arkansas, with my father. I staid there from 1858 to 1868. When I left there I lived in Ellis County, Texas, from 1868 until four and a half years ago. I left there in the summer of 1886. I was elected sheriff of Ellis County in 1882, and served one term. I had been deputy sheriff of the county five or six or seven years before 1882. I served my term as sheriff out. I went from Ellis County to New Orleans and staid there four or five days, when I went to Livingston, Central America, and staid there some two months, and came back to New Orleans about the last of September or first of October,

1886, in a very poor condition, physically and financially. I then went up in Mississippi and stopped at a little place on the railway between Memphis and Greenville. I went to Hot Springs from there in February, 1887, and staid in the city two or three months, and then went to my brother's place, about fourteen miles from the city. I staid there for two years or more, until last February a year ago, when I went to Texarkana, in February, 1889. I know the defendant in this case. I met him in Texarkana some time in 1889. After I arrived there I was introduced to him on the streets by a man by the name of T. R. Cornwall. I don't remember that I had any transactions with Williams just after that. Never had any business with him at all until last year. The first I remember was along about the last of February, 1890. He met me one day and asked me how I was fixed, and I told him I had very little; and he said, in rather a joking way, it was no use for a man to be broke when he could go out and rob a train and get all the money he wanted. He laughed about it a little, and I thought he was joking. He came to me again a short time afterward and asked me how much money I had, and I told him "a little;" and he said, "What is the use of being broke all the time, when it is so easy to rob a train and have plenty," and told me it could be done, and if I wanted to go into anything of that kind he had a couple of good men, and we could go into something of that kind. This conversation occurred on the streets of Texarkana, between Jim Whitener's stable and Hall's corner. I told him I did not want any of it, and thought he was joking about the matter, and did not pay any attention to it. After that he came to me again and stated that he had either written or was going to write to McDaniels, at Hot Springs, and then afterward he told me he had seen McDaniels in town. This was in March, while the March term of the District Court was in session. He then introduced me to McDaniels on the street, and McDaniels got on a drunk that or the next night. Williams came to me again, and said McDaniels was sober now, and that Jim Ratcliff was either there or could be there that day, and we could go out and hold up the Cotton Belt train. John Williams, the defendant, introduced me to McDaniels after McDaniels came back from Hot Springs. I did not see McDaniels drunk. The next day Williams came to me, right along between the corner where we turn up from the Bowie saloon and by the bank where a house had been burned down, and told me that we could go out that night. And I told him that if he was in earnest he had better drop it, as he would get into trouble; and besides, I would not go into anything of that kind with a man like McDaniels, who got drunk; that McDaniels was drunk the night before. He said he would make McDaniels pledge himself never to take another drink. Several days after that he came to me again, and said McDaniels was back again and had pledged himself that he would never drink any more, and we could go

out and rob that train, and I told him I wanted nothing to do with it. He then went off. This was Napoleon McDaniels. Along about the 1st of April Williams came to me and asked me if I wanted to go on a fishing spree down on Sulphur. He said that McDaniels and I could go down in a hack; that he would make arrangements around at Whitener's stable; that he had to go down on Sulphur to buy a lot of stock from Bob Harrell. In a few minutes McDaniels came up, and we went down on Sulphur in an open-top two-horse hack. We took some "grub," bed clothing, and fishing tackle. McDaniels got them and put them in the wagon. Williams told McDaniels where to go. I had seen Jim Ratcliff around Whitener's stable. I think I had been introduced to him by Williams or some one. We went down somewhere within two or three miles of Ratcliff's place. They said it was Sulphur Bottom. We got down there in the afternoon, and Williams and Ratcliff came to the camp and joined McDaniels and I. After dinner Williams told Ratcliff to get on the horse Williams had ridden there and take it to Whitener's stable, and to get on the train and stop at a little station and that we would rob it. Ratcliff rode a little bay mare there and Williams rode a black horse. We were to leave Ratcliff's horse at the camp for him to ride home and Williams was to come back to town in the hack with us. He told him to buy a ticket to a little station where an old mill had been, about three or four miles below the Texas & Pacific crossing, about four miles from Texarkana. This was the first place where the train stopped going south after the crossing. He told me that when the train stopped there we would meet it there and rob it. That when they put Jim off there he would keep the passengers in the cars, while Williams and McDaniels and I were to hold up the train. I asked him what he meant by that, and he said, "that he was going to rob it." And I then tried to get him to let me stay and keep camp for them, but he would not allow that, and said I "was as guilty as anybody." Ratcliff started toward town about two hours by sun. We then put on some old clothes and went to the Cotton Belt railway, getting there after dark some time. We walked from the camp to the railway; me, McDaniels, and Williams went together. We went down the railway to the old mill place, and Williams said "that was the place to rob the train." And he commenced looking around for a suitable place. McDaniels and myself were to go on the engine when it stopped, and run it down the road a piece. He looked around and did not find a suitable place, and then said that "that was as good as any, and you boys go on each side, and you can get on the engine." I told him that Ratcliff said that was not the place, and that it was about two hundred yards below, and then I saw the train coming, and ran down the track a piece, about fifty or sixty yards, and sat down in the bushes, and the train ran on by us before McDaniels could get on the engine and Ratcliff get off. I was sitting about twenty

steps from the track, and the rear end of the coach was about even with me when it stopped. We then all got together and went back to the camp. I did not want to rob that train, and saw a chance to make a miscarriage of it and let the train pass, and that caused that train to be saved from robbery. Williams got mad at me, and said "it was a put up job." McDaniels was on the other side of the train from me when it stopped, and said he did not have time to get on the engine before it started. We staid at the camp that night and went back to Texarkana next morning. Didn't fish but little, and did not hunt at all. No one there except us four. We went back to Texarkana in the hack—Williams, McDaniels, and myself. I think this was along about the 10th or 12th of April; probably a little later than that.

The next arrangement was made when Williams met me on the street one day eight or ten days after this, and he said that Ratcliff was in town and we could go out that night and rob the train at the Texas & Pacific crossing, and I tried to persuade him to let it alone; and he said that McDaniels would be there and he would go out horseback, and McDaniels whistled at me then and said everything was all ready and to come on and go. McDaniels and I then went down the railway to the place where we were to meet Ratcliff before we got to the crossing, and found him there. This train was to be robbed there when it stopped for the crossing. Just after McDaniels and myself met Ratcliff on the road, probably half or a mile from the crossing, we heard some one coming toward Texarkana, and we got off the track, and Williams then came up and said he met this man on a trestle, and the fellow knew him and spoke to him, and asked him what he was doing, and Williams jumped off the bridge and did not speak. I do not remember this man's name. I think it was some old fisherman. I told Williams if that man knew him, and spoke to him, that it would not do to rob the train, as this fellow would tell about it. So we concluded to give it up; and McDaniels, Williams, and myself went back to town, and Jim Ratcliff went off on his horse. We got back to town about 10 or 11 o'clock, I guess. I think this was toward the last of April. I do not remember whether I saw Williams the next day or not. I saw him every day or two.

We went out another time after that to the spur switch (where it was afterward robbed), and the train was late, and we came to the conclusion it was a made-up train. It was during the Spring Palace, and they made up trains, and we thought we would not get anything on it, as there was seldom anything sent out on them. We waited until we knew it was an hour or two late, and then broke up and went back to town. There was another night set for robbing the train, and Williams told me to go over to an old brick yard on the southwest side of town, and he, McDaniels, and Ratcliff would meet me at the switch. Instead of going to the place where he said, I laid down in the woods, and ·

when I heard McDaniels whistle for me I did not go to him. McDaniels was to meet me at the old brick yard and bring the old clothes. I do not know whether he brought them or not. I had a pistol and a mask, which John Williams gave me. I tore up the mask and rolled it up in a ball and threw it on the brick kiln. I then made up my mind I would leave Texarkana, but did not have money enough, and was waiting around there to see Captain Hargis, who is a friend of mine. I met McDaniels and Williams on my way back to town that night, and asked McDaniels why he did not come for me; that I had been there and waited and whistled for him, and I thought that he had fooled me, or something of that kind. Williams spoke to me several different times about going out again, and I got out of it one time by saying I had the sore eyes, and another time that an old friend of mine was with me in town, and if I came back late at night he might suspect that I was into it, and put him off several other times with excuses of that kind, until the robbery occurred. The night of the 8th of June, Sunday night, was set for the robbery, and it rained; and when I met Williams I told him I had been sick and did not want to get wet; and he said, "Well, let's go out and tell McDaniels." We then walked down to the Cotton Belt depot, and found a train just pulling out, and got on it and rode down to the office in the yard, where we got off, and then walked down the railway. This was just a little while before night, in the afternoon, before the day of the robbery. We staid at McDaniels' house a little while, and came back to town. Williams talked to him about the robbery, and told him we would put it off until the next night—that it was so wet he did not think Ratcliff would come, and that he would go out and get Ratcliff the next day, and for him and I to meet them at the spur switch. We left McDaniels' house to come back to town about dusk. We went down the street to the railway, and walked down that until we struck the water tank, where we struck a train and rode up to the depot. I think it is about a half a mile from the Cotton Belt depot to McDaniels' house; the house is about 300 yards from the railway track. My understanding was that McDaniels was living in Williams' house. Williams and I went to town about dark. We stopped on the railway at the stock yards, talking with a white man and a negro. Williams and I did not stay together that night. We separated when we got down town. Williams told me to go out to my girl's house and stay until late in the afternoon. He meant Mr. Jackson's house; he was referring to old man Jackson's daughter. He told me to go out in the woods from Jackson's house and wait for him; that he would come along about dark, and to meet him about on the far side of Rosborough's mill and we would go to the spur switch together, and McDaniels would be there with the old clothes and we would rob the train. He told me to meet him about dark. Williams told me this on the way back to town from McDaniels' house that even-

ing. I went out to Jackson's house the next afternoon and staid there until just before night. His house is thirty or forty yards from the railway. I had been in the habit of visiting at this house. I went there about 2 or 3 o'clock and staid there until nearly night; sun nearly down when I left. I did not take supper there. This was Monday evening on the 9th of June. I came on back toward town until I got nearly to McShane's store and turned off into the wagon road and sat down until Williams came along and we went out together to the spur switch. It was over half-way back to town where Williams joined me from the spur switch. Williams came up along the railway and whistled, and I answered and went to him. I was off from the track a little piece in the bushes. This was after dark a little. We went direct to the spur switch and met McDaniels and Ratcliff and divided the old clothes about and disguised ourselves. McDaniels had the old clothes then. The train came along about 11 or 12 o'clock. We waited around the switch, part of the time sitting on a log and part of the time sitting on the ties. The train was late. I do not know who brought the old clothes. McDaniels had them in his possession and unfolded them. They were all in a bundle. We put on our masks a few minutes after we got there. I do not think Williams put on any of the old clothes, saying that he was going to stand out in the bushes where he would not be seen. When I went out to the spur switch I had on this coat and vest and a striped pair of pants, a flannel shirt, and a black slouch hat. They gave me a pair of pants, which I slipped over my pants; they were old dark colored pants of common material. Williams told me to give this coat to Ratcliff, and he told Ratcliff that he had rode on the engine so much that the engineer and fireman were liable to recognize him should they see him, and told me to change coats with Ratcliff, and we did so, and had him to button it up. Ratcliff had been wearing a sack coat. This is a frock coat. I then put on a sack coat McDaniels gave me out of the bundle. I never saw it in daylight and could not tell it now. It looked black in the night and seemed to be of a dark color. It was an old coat and had the lining torn. I did not change my vest; buttoned my coat up around my neck. Ratcliff buttoned up his coat and said it made him taller. Williams did not make any change. If he did I did not see him. McDaniels put on an old coat, and had an old hat with a wide brim for me, and I think another for himself. He had a cap at one time, but do not remember whether it was this time or not. McDaniels had a mask for me. He had a black silk handkerchief and cut the eye-holes right there and gave it to me. I tried to get him not to cut it, but he did it. I don't know whether I could recognize the mask or not. I put on mine. Williams had a mask. It was a good long time before the train came along. Williams had a calico mask at one time, but I do not know whether he used it that night or not. Three of us had on masks. I am not certain that Williams

put on a mask. After the robbery when I met Williams he had a calico mask at one time. They were all made of an old piece of cloth, except this silk handkerchief.

We lay around there until the train came along. I had a six-shooter which John Williams gave me some time after we went on that fishing spree. Ratcliff had a Winchester rifle, which they said was John Williams'. He claimed it. Ratcliff had on a cartridge belt. Don't know whether it was made for a Winchester or pistol. I think he had cartridges in it. I know he had on a belt, because when we went to sit down on a log he pulled it off and laid it down. McDaniels had a white-handled six-shooter. I think it was a short-barrelled 45-caliber pistol, but can not remember. Williams had a six-shooter. I had nothing besides my six-shooter. I did not see any other arms besides these six-shooters and the Winchester and McDaniels' pistol. Mc-Daniels had a little white sack which I took for a 25-pound flour sack. He said he was going to put the "boodle" in it. I did not see any lantern there. The train came along between 11 and 12 o'clock. I did not have a watch. Williams looked at his sometime before that and said it was right smart late, and I tried to get them to go back to town. Williams and McDaniels went up to where the target was and turned the switch. I told them that we had better not turn the switch, that a freight train might come along; and Ratcliff said that he could tell the difference between a freight and passenger, and threw it for them. It was thrown a good while. They threw it just before they thought the time for it to come had arrived. They had a bunch of railway keys which Williams said he would throw down, and when they were found people would think it was done by railway men. This was before he went up to throw the switch. I tried to get them to let it go that night, as the train was running late and would be running fast, and would run off the end of the spur and might kill some one. Mc-Daniels said "he didn't give a damn if it killed every man on it." And John Williams said "he did not think there was any danger that any one would be killed." And Ratcliff said "he had fired long enough to know that the train could be stopped without wrecking." And John Williams then said he doubted whether the engineer would run into the switch, as he might see it and stop the engine. I do not know of anything being done to the target when Williams and McDaniels turned the switch. I was south from the switch, sitting on the ties. I could hear the switch rattle when they turned it.

We sat around there until the train came up, and when we heard it coming, Williams said, "Boys, all get to your places." John Williams, the defendant here, was directing all the movements. Williams and McDaniels went on the south side of the track and Ratcliff and I on the north side. That pile of cord-wood is on the north side of the track. Ratcliff told me to squat down behind the wood and he would

get down behind a stump.   Mr. Williams and Ratcliff and McDaniels talked the arrangements over before the train came, and it was agreed that McDaniels and myself were to go on each side of the engine and take the engineer and fireman and make them open the door of the express car and McDaniels was to go in and rob the car.   Williams and Ratcliff were to hold back the passengers in the cars.   When the train run up and passed me pretty rapidly, I knew it was going off.   I saw the large wheels of the engine begin to slide on the rails, and the engine slid right off the end of the track, and I broke and run and was going back to town and tell it, as I thought the engineer and fireman would be killed; and Ratcliff hallooed, "damn me, to stop," and shot at me, and said, "G—d damn you, if you don't stop there, I will kill you." That is the first shot I heard there.   Ratcliff made me come to where he was and go in front to that car and help "Brown," which was the name we were to use for every one.   Williams gave that name to us. If we wanted to call one another we were to say and answer back "Brown."   I told Ratcliff I was hurt, and he said, "Go on, or I'll kill you," and I went between the cord-wood and saw McDaniels get out of the car and go into the bushes with the train men, and I got on top of the railing of the car and watched the train men with McDaniels, one of them sitting down and the other two standing up, and McDaniels got around them and called "Brown" to Ratcliff, who was going toward the place where McDaniels and the train men were, and got out a little way from the track and got tangled up in some bushes, and Ratcliff then passed a little ahead of me, and I saw McDaniels raise his pistol and shoot, and I jumped behind Ratcliff.   We were a little bit apart, and then Ratcliff commenced to shoot very rapidly, and when McDaniels fired the second time, Ratcliff shot again and bent down, and I jumped and grabbed him and said, "Don't shoot, that is 'Brown' shooting at you, and not the train men;" and he said, "Damn him, he has shot me," and I heard one of the train men halloo and fall and say, "Don't shoot me, I haven't done anything."   Ratcliff and I went along close to these men, and I whistled and John Williams came up, and I said, " 'Brown,' is that you?" and he said, "Yes;" and Ratcliff said, "John, he has shot me."   And John Williams commenced crying, and asked if he was hurt, and Ratcliff said he did not know, that he could feel the bullet; and we then led him off into the woods a piece, and I went back to the cord-wood to get the clothes that McDaniels and I had left there; and when I got back we all went out to where Ratcliff's horse was hitched, about 300 or 400 yards, when Williams, Ratcliff, and I got together.   McDaniels had run.   Williams said he saw him running like a deer.   Williams called to him, "Brown," and McDaniels hallooed "Brown," and waited for us until we could come up, and then Ratcliff told him that he had shot him, and McDaniels said he was sorry for it and did not

intend to shoot him. I don't know about any other conversation until we separated. When we got to where the horse was, we changed our clothes, and I got my coat from Ratcliff and got my hat, and took the old mask and stuck it in the coat I had on; and Williams told McDaniels to tie the clothes on to Jim's saddle, and for Ratcliff to take them down home and burn them up, and for him to hold on to his horse and get home as soon as he could, and that he (Williams) would be down to see him to-morrow. I never saw the clothes any more. John and I went on back to town together. We left McDaniels and Ratcliff at the forks of the road together. Williams said that he had to get back to town, that the officers would come to his room to get him to help hunt the robbers, and that he wanted to get home as quick as he could. My understanding was that Williams was deputy sheriff and detective. I heard of his doing a good deal of detective work. That was one reason I was afraid of him when he spoke to me about the robbery.

Williams and the rest did not think that there would ever be anything come up about this robbery. Afterward, from the way they talked, Williams said that he had never known any one to hang or be sent to the penitentiary unless they gave one another away, and McDaniels said he could prove an *alibi* by his family, and Williams said he could prove an *alibi* for himself and me without any trouble. I was talking to him about the matter one day and said I had no way to get out of it, and he said he would have no trouble to prove an *alibi* for me, and said "that he had a good place where he could prove an *alibi;* that it was at J. D. Hall's; that some one had been trying to break into Hall's safe, and that Hall would come up and swear that they were all there in his store watching his safe."

When Williams and I left Ratcliff and McDaniels in the road * * * we came back to town very rapidly, trotted part of the way. Williams was in a hurry to get to his room before the officers got there. The ground was wet from the rain of the Saturday before, and our feet were wet and pants wet and muddy. We separated when we got across the creek, and I went to my room over on the Arkansas side of town, the first building east of the Arkansas postoffice. I think the next time I saw Williams was on Wednesday night—might have been Tuesday. He was standing in front of Catlett Bros.' saloon, in front of Ghio's Opera House. I asked him why he was not out hunting the robbers, and he said he had not been paid, or there was no money in it. He and Si Porter were around there. Si was inside the house. I started up the street a piece, and Williams came up to me and asked me if I had heard anything about the robbery, suspicions, etc., and I told him no. The next time I saw him was the evening before he was arrested; he was in Mr. Whitener's horse lot. I went over there to attend to a call of nature, and Williams came over to me and asked me if I had heard any-

thing of the robbery, and said that McDaniels got "so damned excited" he lost his coat and that somebody had found it, and that he had got it and had to give it up to George Edwards, and that he was satisfied that he was going to "pinch" McDaniels that night. He told me to get some money and skip into Arkansas and he would leave the next night; that some one had been talking to him about going away. He said we could name a place and he would come to me; that McDaniels had hid the money, and for me to go and get it. I did not want to go, as I was waiting to see Captain Hargis, one of the agents of the express company which we robbed, and tell him all about it, and if he wanted to hang us all he could do so. I called on Captain Hargis that evening and told him I had a little private matter I wanted to tell him, but he was very busy and had to go out on the road that evening. I had known Captain Hargis and worked for him in Dallas.

The next time I saw Williams was in jail. He was arrested that night. I was arrested on Saturday by Si Porter. Saturday morning before I got up a Mr. ―――― came and asked me if I had heard of my being suspected of being connected with the train robbery, and said he had heard it on the night before, and told me that I had better get to doing something if I knew anything about it, and about this time "Dutchey" came in and asked for a man by the name of Tom Carr, and I then got up and went over to the Texas side and met Si Porter, and he told me that George Edwards (the sheriff) wanted to see me down at his office. I do not know what became of that stuff McDaniels got out of the express car. Williams, I think, opened the sack when we changed clothes, and took out a package and told McDaniels to take the stuff and take care of it until we could divide it up. Before we got to town Williams told me to strike a match, and he opened the package, and as well as I can remember there was $15 in it, and I believe a dollar or two in silver, and he then started on, and then turned around and gave me $4 for spending money, and said, "We need the rest of this to use on Jim Ratcliff," and that he would go to see him next day. I jerked my mask off when we got out in the woods together and put it in the pocket of the coat I had on, and left the coat with McDaniels and Ratcliff. I don't know whether they all took them off there or not. I noticed when we walked up to Williams that he was taking his off his face. I threw the six-shooter that Williams gave me in an old well. Williams told me on the evening before he was arrested to make way with it, that the pistol had a history and one man in the town knew it, and it would not do for it to be found. I wrapped a string around the hammer and the guard and dropped it in a little old well in the rear of the Arkansas postoffice, between it and the house I was living in, near the walk to the privy. I dropped it down there one night. The well is boxed up about four feet from the ground. [Pistol here shown to the witness and identified by him as the

one he put in the well and given to him by Williams.] Williams did not tell me what the "history" of the gun was. That is the way I tied the pistol before dropping it in the well. I did not examine Jim Ratcliff's wounds. He always looked to be shorter than me, but when he straightened up he might be taller. He was in the habit of stooping over. My coat gave him the appearance of being taller than me. I saw where he was shot after he was brought to the jail, and on the next morning after the robbery I found a bullet hole in my coat. There were lead stains in the coat from the bullet next morning, and I knew it was not there on the night before when I took it off. There were three buttons on my coat that night; only two now. I have worn the coat this winter some; not much. When I was put in jail I had on a little thin coat, and never saw this coat any more until last October in Texarkana when the trial came up. The hole goes clear through the coat. That night before we separated Williams told McDaniels to go down to see Ratcliff next morning, as he would have to go with the officers, and for McDaniels to let him know how he was. The night of the 9th of June, 1890, was pretty dark, and I think a little cloudy and damp. I think I first told George Edwards what I had done with that pistol. He was sheriff then. I told him I had put it in the old well. I told him last September or October, during the fall term of court at Texarkana. I also told Mr. Edwards where to look for the old clothes that Jim Ratcliff took back on his horse that night. I told him that these clothes were down in an old well at Jim Ratcliff's. The understanding was, when we separated, that they were to be taken down there and burned, but Williams told me that Ratcliff was hurt so that he could not burn them and that he had put them in the old well. The mask I had on that night was made of a silk handkerchief. [Witness here shown mask found in the coat and coat found in road by Sanders.] This is exactly the kind of mask I wore that night. This coat feels very much like the one I had, with the lining of one of the pockets torn out. It was a dark night, and the coat looked black to me. I can not state whether it was or not. McDaniels changed clothes that night. He put on a coat, I know, and I think he put on a pair of pants over his. I did not see him put on any boots. It was a dark, cloudy, damp night. Saturday night and Sunday it had been raining, and the ground was damp and wet. I don't know what sort of breeches John Williams had on when he went out there. It was dark, and I did not see them in the light.

On cross-examination witness testified as follows: I was indicted in Bowie County for the offense of murdering this man Hackett. I understand that my case has been *nolle prossed.* I was also indicted for three other offenses at the same time. Nothing has been done with them. I gave bond for my appearance in court. I had an understanding with Mr. Baldwin and Mr. John King about the disposition of my cases be-

fore I testified in these cases. They agreed to *nolle prosequi* all cases against me if I testified in all these cases they wanted me to testify in. I heard that there was a reward offered for the apprehension of the people engaged in that robbery. I think I told McDaniels and Williams when we were first arrested that George Edwards had offered to cut the reward in two if I would tell all I knew. Edwards had told me that somebody was going to make some money out of this, and if I knew anything about it I had better tell all I knew before I was locked up, but he never offered to pay me any money to testify in the case at all. I do not know for certain that the $4 I got from Williams was a part of the "swag" or not. I say $15 came from the express package, but whether this $4 came from it or not I could not say. It was very dark, and he reached back and said, "Here, take this," and said he had to use the rest on Ratcliff. I think Ratcliff was shot pretty near the left side. I never saw the place where the bullet entered but once, and that was when he was lying on his bed, and I was in jail looking through the grates and could not tell where the hurt was located. This was the first train robbery I was ever in.    *    .*    *

*O. C. Porter* and *R. D. Harrell*, for appellant.

*R. H. Harrison*, Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE.—Appellant was indicted in the District Court of Bowie County for the murder of one Mike Hackett.

In substance, it was alleged in the indictment that the murder was committed by appellant in the perpetration of a railway train robbery committed by him on the 9th day of June, 1890, by which, in the derailing the cars for the purpose of the robbery, the said Mike Hackett was killed. It is also charged in the indictment that the said defendant, after the train was derailed, robbed one Neblett, the express messenger on the train, of certain property and money in his possession, which was being transported by the express company for certain parties whose names are mentioned.

A motion was made to quash the indictment for uncertainty and insufficiency. This motion was overruled, and we think rightly, the indictment being sufficient to charge the offense of murder in the perpetration of robbery.

The record before us is a very voluminous one, containing more than two hundred pages, most of which is taken up by the statement of facts. There are only three bills of exception reserved to matters transpiring at the trial.

The first bill was to the competency of juror Murphy. The court's explanation to this bill of exceptions shows that the juror answered the

questions propounded to him on his *voir dire,* establishing his competency fully, and even if such had not been the case, it is not made to appear in the record that defendant exhausted his peremptory challenges before the jury was completed, and such being the case, he would have had no right to complain, even if the juror had been incompetent.

Defendant's second bill of exceptions was reserved to questions asked the witness Mrs. McDaniels by the district attorney.   One McDaniels, husband of this witness, had been previously tried and convicted of this same offense, he being a party to the robbery.   His wife, when put on the stand by the defendant, was asked by the district attorney, on cross-examination, if she knew the result of the trial of her husband, and she answered she did; whereupon the district attorney further asked her what was the result of the said trial, to which defendant objected, and the court sustained the objection, and the witness was not allowed to answer this last question.   Under the circumstances developed we can not see that any error or prejudice to the defendant's rights was committed, the court having sustained defendant's objection as soon as it was interposed, and the witness not being allowed to answer the question.   We can not see how the appellant could reasonably complain.

Defendant's third bill of exceptions was taken to remarks used by the district attorney in his closing argument to the jury.   The court explains this bill of exceptions by stating that what the district attorney did say was in answer to remarks made by counsel for defendant to the jury, to the effect that the defendant was on trial before strangers and among strangers; to which the district attorney replied, after repeating the remarks made by defendant's counsel, that if the defendant was tried before strangers the State was not responsible for it, because the defendant had removed his case from Bowie County, where he was known, to Cass County, and that the record would show it. This explanation by the district judge shows that there was no error in the matter complained of.   The district attorney had the right to reply to defendant's counsel, and show why it was that the defendant was being tried by strangers.

The charge of the court in this case presented the law correctly on all the legitimate issues raised by the evidence, and there was no error in refusing the special requested instructions of defendant, which were refused.

One of these special instructions was a request of the court to charge upon murder in the second degree.   The court did not err in refusing so to charge, because all the evidence showed that the murder was committed in the perpetration of robbery, and a murder so committed is expressly made by our statute *per se* murder in the first degree.   Penal Code, art. 606.

The evidence in the case does not admit of a shadow of doubt, in our opinion, of this appellant's guilt, and, furthermore, shows that he was the instigator and prime mover of the crime which was committed. No error is made to appear which requires a reversal of the judgment, and it is therefore affirmed.

*Affirmed.*

Davidson, J., being disqualified, did not sit in this case.